# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| **JORGE HARRIS,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 10-848** |
| | : | |
| **FELIPE ARIAS, M.D., et al.,** | : | |
| **Defendants.** | : | |

_____:

**Goldberg, J.**                                                              **October 24, 2013**

## MEMORANDUM OPINION

On May 27, 2005, Plaintiff, Jorge Harris, then an inmate at State Correctional Institution (SCI) Graterford in Montgomery County, Pennsylvania, suffered a serious injury when he was poked in his right eye during a basketball game. On February 5, 2008, Plaintiff was taken to the University of Pittsburgh Medical Center in response to uncontrolled pressure within that same eye. Dr. Evan Waxman tentatively diagnosed Plaintiff with steroid-induced glaucoma and optic nerve damage, and informed him that his vision, which had deteriorated to the point that he was unable even "to count fingers in front of [his] face," was permanently lost in that eye.[1]

This lawsuit concerns the care Plaintiff received in the Pennsylvania prison system between those two dates. All defendants, who include several of Plaintiff's treating physicians, as well as Prison Health Services, Inc., now move for summary judgment. They argue that Plaintiff's claims are barred because he failed to exhaust his administrative remedies, because he did not file his complaint prior to the expiration of the statute of limitations, and because discovery has failed to produce evidence to support his claims. For the reasons discussed below,

_____

[1] (Arias Br., Ex. K, Waxman Dep., at 36-41, 56.)

with the exception of a few claims that Plaintiff concedes are insufficient to go forward, Defendants' motions will be denied.

## I.    Factual Background and Procedural History

The following facts are set forth in the light most favorable to Plaintiff, the non-moving party. Because the merits of Plaintiff's claims are at issue with respect to only two defendants—Dr. Randall Bell and Prison Health Services—the following summary is not a full discussion of Plaintiff's treatment, but pertains only to those facts necessary to decide the current motion, or to provide context.

Immediately after being poked in the eye on May 27, 2005, Plaintiff was taken to the prison dispensary,[2] where inmates with "acute or life-threatening" injuries can be seen. (Arias Br., Ex. D, Stefanic Dep., at 75, 86.) Plaintiff was seen by Dr. Richard Stefanic, a Prison Health Services employee, who noted that Plaintiff was "complain[ing] of pain and blurry vision," and sent him to be evaluated at Mercy Suburban Hospital. (Arias Br., Ex. D, Stefanic Dep., at 86-87.) At the hospital, Plaintiff was diagnosed with a scratched cornea and placed on antibiotic eyedrops to guard against possible infection. (Arias Br., Ex. C, Cusick Dep., at 38-39; Arias Br., Ex. G, Harris Dep., at 14-17.) He was then released back to the prison.

Five days later, on June 1, Plaintiff was seen by Dr. Richard Cusick. Dr. Cusick observed some bloodiness in the white of Plaintiff's eye, and Plaintiff complained of photophobia, an abnormal sensitivity to bright light. Otherwise, however, Plaintiff could move the eye fully and

---

[2] Testimony suggested that there are essentially three places within the prison where an inmate might receive medical care through Prison Health Services. The first is "sick call," which is similar to a walk-in clinic that inmates pay to attend (at least those who can afford it). (Arias Br., Ex. J, Masino Dep., at 91.) Inmates whose condition after evaluation at sick call requires further treatment by a physician might be referred to the "doctor line," which is like a scheduled office visit with one of the Prison Health Services doctors. (Arias Br., Ex. E, Nwosu Dep., at 68.) Finally, there is the dispensary, which is essentially the prison's "equivalent of an emergency room." (Arias Br., Ex. D, Stefanic Dep., at 48.)

had reactive pupils. Dr. Cusick switched Plaintiff from antibiotic eyedrops to antibiotic ointment, and gave Plaintiff a pass to the dispensary where he could apply ice to his eye several times a day, but otherwise left the treatment regimen unchanged. Dr. Cusick also ordered that Plaintiff be seen by an ophthalmologist at the next clinic held on-site at the prison. The importance of this order was emphasized by the double-underlining of the word "next." Despite this order, Plaintiff had not seen the ophthalmologist before Dr. Cusick saw him again two weeks later. At that time, Dr. Cusick indicated that Plaintiff's eye was improving slowly, though some complaints of photophobia and "floaters" (spots in the visual field) remained. Plaintiff was ordered to continue to "protect" the eye and apply ointment, and return to the clinic in six weeks. (Arias Br., Ex. C, Cusick Dep., at 39-40, 42, 44-50.)[3]

Plaintiff's six week follow-up occurred on July 29, 2005, with Dr. Caleb Nwosu. (Arias Br., Ex. E, Nwosu Dep., at 64.) Again, despite Dr. Cusick's earlier orders, and despite the fact that ophthalmology clinics were held at Graterford once or twice a month, Plaintiff had still not been seen by an ophthalmologist in the prison. (Arias Br., Ex. I, Bell Dep., at 23-24.) Dr. Nwosu noted that Plaintiff complained of severe headaches when exposed to bright lights, but observed that the eye was "clear," without redness or discoloration. (Arias Br., Ex. E, Nwosu Dep., at 64-66.) At deposition, Plaintiff testified that in the weeks following his injury he suffered from blurry vision and photophobia, along with headaches that he described as "constant pressure." (Arias Br., Ex. G, Harris Dep., at 18-20, 32.) Dr. Nwosu ordered an ophthalmology referral. As he understood the Prison Health Service's policies, this was accomplished by "writ[ing] an order

---

[3] In between these two appointments, Dr. Stefanic saw Plaintiff for a biannual physical. Plaintiff's vision was recorded as 20/20 in both eyes (with correction), and his eyes and pupils were observed as "normal." (Arias Br., Ex. D, Stefanic Dep., at 95-96.)

referring [the inmate] to a specialist, and then the order is taken out and the people that handle it will arrange the appointment." (Arias Br., Ex. E., Nwosu Dep., at 42.)

On August 30, 2005, more than three months after his initial injury, Plaintiff was examined by Dr. Randall Bell, the first time an ophthalmologist had evaluated his eye at Graterford. (Arias Br., Ex. I, Bell Dep., at 43.) Dr. Bell recorded his initial impressions as "traumatic cataract with anisocoria, iris irregular, ? old traumatic, T. [meaning traumatic] glaucoma." (Arias Br., Ex. N, Bell 8/30/05 Consultation Record.) Dr. Bell testified that the word "traumatic" standing alone was a reference to "traumatic neuropathy," which in his view would have been apparent to another doctor reviewing the chart. (Arias Br., Ex. I, Bell Dep., at 46-49.) The reason for this diagnosis was that Plaintiff's "right [optic] nerve showed significant damage." (Arias Br., Ex. I, Bell Dep., at 46-49.) Dr. Bell prescribed Pred Forte eyedrops (a corticosteroid) as well as Xalatan eyedrops, the latter drug being used to reduce intraocular pressure (IOP). (Arias Br., Ex. N, Bell 8/30/05 Consultation Record.) Dr. Bell testified that Pred Forte was prescribed because Plaintiff had symptoms consistent with traumatic uveitis (inflammation), but acknowledged that he did not record this potential diagnosis in Plaintiff's chart. (Arias Br., Ex. I, Bell Dep., at 50-51.) Also of significance, Dr. Bell testified at deposition that Plaintiff's eyes exhibited a "reverse Marcus Gunn phenomena with the pupil," in which his right pupil did not react to light, an indication of optic nerve damage. (Arias Br., Ex. I, Bell Dep., at 45-47.) Although this finding was not specifically recorded in Plaintiff's chart, Dr. Bell testified that "the anisocoria covers that." (Arias Br., Ex. I, Bell Dep., at 47-48.)

Regarding the Pred Forte drops, Dr. Bell testified that the "significant complications" included that it could "stimulate growth of the herpetic virus," "worsen cases of corneal ulcer," or "cause a rise in intraocular pressure in patients that we call steroid responders." (Arias Br., Ex.

I, Bell Dep., at 53.) Because of these possible side effects, he explained that if the Pred Forte fails to improve the condition within two days, the patient should be reevaluated. Dr. Bell also acknowledged that some literature suggested that use of Pred Forte for longer than ten days requires routine monitoring of intraocular pressure. (Arias Br., Ex. I, Bell Dep., at 51-52.) He further indicated that there are "no circumstances" under which he would prescribe Pred Forte for 180 days, and that his normal practice would be to prescribe if for between 30 and 60 days. (Arias Br., Ex. I, Bell Dep., at 59-60.) Despite this acknowledgment, the order Dr. Bell wrote for August 30, 2005, which was co-signed by Dr. Felipe Arias, the site medical director at the time, included the notation "X 180 days," indicating a six-month prescription.[4] (Arias Br., Ex. N, Physician's Order Sheet, Entry 8/30/05.)

Along with the medications, which Plaintiff began using, Dr. Bell ordered a return visit in two months, and Plaintiff saw him again on October 4, 2005. This time, Dr. Bell did note "uveitis," along with "glaucoma," but otherwise his diagnosis remained the same. (Arias Br., Ex. I, Bell Dep., at 69.) He re-ordered Pred Forte and Xalatan, and Dr. Arias co-signed an order prescribing the drugs for 180 days. (Arias Br., Ex. N, Physician's Order Sheet, Entry 10/4/05.) Dr. Bell recommended a return visit in four months. (Arias Br., Ex. I, Bell Dep., at 69.)

Plaintiff was next seen on December 2, 2005 by Dr. Nwosu, in response to lab results that indicated increased creatinine levels, an indication of possible kidney problems. (Arias Br., Ex. E, Nwosu Dep., at 80-81.) Plaintiff had no kidney-related complaints, however, and instead tried to focus the discussion on the worsening condition of his eye. Dr. Nwosu did not conduct an eye exam, or refer Plaintiff to a specialist at that time. (Arias Br., Ex. E, Nwosu Dep., at 80-81.)

---

[4] Dr. Bell denies writing the prescription for this long, and testified: "It was my understanding that when I wrote an order like this it was good for 30 days." (Arias Br., Ex. I, Bell Dep., at 60.)

Plaintiff's next visit to a doctor in the prison was with Dr. Nwosu on March 17, 2006, where he complained of worsening photophobia and said that the eyedrops were not helping. (Arias Br., Ex. E, Nwosu Dep., at 92-94.) Prior to seeing the doctor, a physician's assistant noted: "Patient visibly upset. States that he was supposed to see specialist mid-February and states has not seen anyone."[5] (Arias Br., Ex. E, Nwosu Dep., at 95.) Dr. Nwosu then noted that, although the inside of Plaintiff's right eye was bloodshot, there was no visible swelling. (Arias Br., Ex. E, Nwosu Dep., at 97.) He prescribed cleansing eyedrops, reassured Plaintiff that his condition was not serious (probably a broken blood vessel), and told him to follow up as needed. (Arias Br., Ex. E, Nwosu Dep., at 98.) Dr. Nwosu also noted that Plaintiff had an optometry appointment scheduled for March 27, 2006. (Arias Br., Ex. E, Nwosu Dep., at 99.) At the optometry appointment, Plaintiff received a referral to Dr. Bell. (Arias Br., Ex. H, Sanders Dep., at 114-16.)

As a result of the referral, Plaintiff saw Dr. Bell on April 25, 2006, almost seven months after his last appointment with that doctor. At that point, Plaintiff was "down to finger counting vision," with an intraocular pressure of 24 in his right eye. Dr. Bell circled this number because it was "significantly higher" than any other pressure recorded for Plaintiff, and because it was approaching what might be a "magic number" for someone in Plaintiff's position, which Dr. Bell viewed as cause for concern. (Arias Br., Ex. I, Bell Dep., at 86, 88-89.) Dr. Bell testified that, at this appointment, he would have "emphasized the severity of the injury" and said that although "I didn't mention blindness . . . I said this was a very serious injury, [and it is] very threatening to your vision." (Arias Br., Ex. I, Bell Dep., at 86, 88-89.) Plaintiff, meanwhile, was growing increasingly frustrated about the lack of improvement in his eye, and Dr. Bell's notes indicate

---

[5]   The mid-February date would have correlated roughly with Dr. Bell's suggestion on October 4, 2005, that Plaintiff have a follow-up appointment with him in four months.

that he was "hostile" and "demanded to know what was wrong with him." (Arias Br., Ex. O, April 25, 2006 Ophthalmologic Exam Record.) In response, Dr. Bell assured Plaintiff that "these meds [are] best." (Arias Br., Ex. O, April 25, 2006 Ophthalmologic Exam Record.) During his deposition, Dr. Bell testified that "these meds" referred primarily to Xalatan, and that he was unsure if he reordered Pred Forte on that date because Plaintiff's condition "was less and less inflammatory and more and more optic neuropathy." (Arias Br., Ex. I, Bell Dep., at 90.)

Dr. Bell's diagnoses from the April 2006 visit reflect an increasing alarm over the extent of Plaintiff's injury. He indicated at deposition that he purposefully included a longer version of his findings because "it was such a severe injury and it had progressed so much," that a "more complete record" was necessary.[6] (Arias Br., Ex. I, Bell Dep., at 90.) His impression now was chronic open-angle glaucoma, with possible Posner-Schlossman syndrome. (Arias Br., Ex. O, April 25, 2006 Ophthalmologic Exam Record.) The latter finding was especially curious, in that it was a rare condition that Dr. Bell noted "in retrospect" Plaintiff did not have,[7] but which Dr. Bell also had other reasons for including. According to Dr. Bell: "I also wrote [Posner-Schlossman] down because it's a great buzz word, and I wanted to make sure if the staff saw this patient, and it was a problem they'd mention Posner-Schlossman, and I'd know that it was Harris, because he was the only one in five thousand inmates that I put down Posner-Schlossman." (Arias Br., Ex. I, Bell Dep., at 78-79.) Dr. Bell again suggested a return visit in

_____

[6] Dr. Bell testified that at this appointment it was "obvious" that "this was a progressive, vision-threatening disease, and [Plaintiff] might very well end up blind." (Arias Br., Ex. I, Bell Dep., at 97.)

[7] Dr. Evan Waxman, who ultimately evaluated and treated Plaintiff at the University of Pittsburgh Medical Center in February 2008, laughed off the Posner-Schlossman diagnosis when asked about it at his deposition, indicating that "[i]t doesn't seem to be very relevant to Mr. Harris." (Arias Br., Ex. K, Waxman Dep., at 75.) One of Plaintiff's experts also faults Dr. Bell for "his knowing documentation of a frankly incorrect diagnosis" of Posner-Schlossman. (Arias Br., Ex. L, Miller-Ellis Rpt., at 7.)

four months. (Arias Br., Ex. O, April 25, 2006 Ophthalmologic Exam Record.) Despite this order, Dr. Bell would not see Plaintiff again for over a year.

Although Dr. Bell was unsure at the time of his deposition whether he had discontinued Pred Forte on April 25, 2006, Plaintiff and the prison medical staff were apparently under the impression that he had not. On June 11, 2006, Plaintiff saw Dr. Nwosu and asked to have his medications renewed. (Arias Br., Ex. E, Nwosu Dep., at 106.) He had no other complaints and Dr. Nwosu renewed both the Pred Forte and Xalatan drops for 180 days. (Arias Br., Ex. E, Nwosu Dep., at 109-10.) When those prescriptions ran out, Plaintiff again returned to sick call for renewal, this time seeing physician's assistant Frank Masino on January 4, 2007. (Arias Br., Ex. J, Masino Dep., at 85-91.) Masino renewed all of Plaintiff's medications, including Pred Forte and Xalatan, this time for 210 days.[8] At the time of the January renewal, Plaintiff had not seen Dr. Bell since April 2006, and Masino acknowledged at his deposition that he knew Plaintiff had been on Pred Forte roughly since his 2005 injury, was unaware of the "side effect profile for long-term use" of Pred Forte, and did not consult with any other doctor (including Dr. Bell) prior to writing the renewal order, although the order was co-signed the next day by Dr. Arias. (Arias Br., Ex. J, Masino Dep., at 92-94, 96-97.)

On May 15, 2007, Plaintiff again saw Dr. Bell. According to Dr. Bell: "My impression now is blindness in the right [eye] secondary to uveitis and glaucoma. My disposition is to again restart the Pred Forte[9] and I raised the Xalatan to twice a day, and return in four months." (Arias

---

[8] The renewal was for 210 days instead of 180 days because of a change in policy that allowed longer prescription periods. The longer period could benefit the inmate, because it meant the inmate could wait longer to return for renewal. (Arias Br., Ex. J, Masino Dep., at 91.)

[9] Notwithstanding Dr. Bell's use of the word "restart" during his deposition, the renewals of Pred Forte by Dr. Nwosu and physician's assistant Masino make it clear that Plaintiff had been using Pred Forte for the entire year between his April 2006 and May 2007 appointment.

Br., Ex. I, Bell Dep., at 103.) Dr. Bell again noted the (incorrect) diagnosis of Posner-Schlossman syndrome. (Arias Br., Ex. O, May 15, 2007 Consultation Record.)

Plaintiff's final appointment with Dr. Bell was September 18, 2007. His diagnosis was essentially the same as the May 2007 appointment, glaucoma and uveitis, with Dr. Bell again including Posner-Schlossman syndrome. (Arias Br., Ex. O, September 18, 2007 Consultation Record.) When asked at his deposition what his basis was for an impression of Posner-Schlossman, Dr. Bell said "[p]robably no basis. It was just to continue the marking of his records that this was a unilateral glaucoma with evidence of some uveitis and glaucoma." (Arias Br., Ex. I, Bell Dep., at 111-12.) When asked what steps he took on this date to lower Plaintiff's intraocular pressure (which was again high), Dr. Bell said that he discontinued Pred Forte on that date. (Arias Br., Ex. I, Bell Dep., at 112.) However, he acknowledged that he took no "affirmative steps" to discontinue the medication, beyond simply not writing it on the order form. When asked why he did not write on the form that Plaintiff should stop using Pred Forte, Dr. Bell responded that "in my opinion it may have been doing some good." (Arias Br., Ex. I, Bell Dep., at 112.)

About a month after his final appointment with Dr. Bell, Plaintiff was transferred from SCI-Graterford to SCI-Albion to better accommodate his asthma. (Arias Br., Ex. G, Harris Dep., at 121-22, 139.) On February 5, 2008, he was taken to the University of Pittsburgh Medical Center because of uncontrolled intraocular pressure in his right eye. There, according to Plaintiff, Dr. Waxman told him that he would never regain sight in his right eye, that his blindness was the result of prolonged use of corticosteroids, and that, had he been treated properly, at least some of his vision could have been preserved. (Arias Br., Ex. G, Harris Dep., at 126-38.) Dr. Waxman stopped the use of Pred Forte (which Plaintiff had still been taking since his last appointment

with Dr. Bell) because "there didn't appear to be an indication for its use anymore, and "it seemed possible that Pred Forte was responsible for the high pressure" in Plaintiff's eye. (Arias Br., Ex. K, Waxman Dep., at 52.)

At a follow-up appointment on February 19, 2008, Dr. Waxman noted that Plaintiff's intraocular pressure had "improved but not enough." (Arias Br., Ex. K, Waxman Dep., at 66.) He ordered the continued use of drops prescribed at the February 5 appointment, but testified at his deposition that "[i]t's not uncommon for the prescriptions we provide to the corrections facility to not be followed. It seemed that they weren't in this case." (Arias Br., Ex. K, Waxman Dep., at 63.) According to Dr. Waxman's understanding, at least one of the medications he prescribed at the initial appointment was not provided to Plaintiff at the prison. (Arias Br., Ex. K, Waxman Dep., at 64.) There was similarly no vision change at subsequent appointments at the University of Pittsburgh (which was no surprise to Dr. Waxman). (Arias Br., Ex. K, Waxman Dep., at 68.) Throughout, Dr. Waxman's diagnoses remained the same: angle-recession glaucoma or steroid-induced glaucoma, along with severe optic nerve damage. (Arias Br., Ex. K, Waxman Dep., at 64.) In layman's terms, Plaintiff was now permanently blind in his right eye.

On January 26, 2010, Plaintiff delivered his pro se complaint to prison authorities. (Harris Opp. Br., Ex. J, Dept. of Corrs. Cash Slip.)

## II. Discussion

Between the two summary judgment motions, Defendants raise three primary arguments. First, they assert that they are entitled to summary judgment on all of Plaintiff's claims because he failed to exhaust his administrative remedies in the proper manner. Second, they argue that Plaintiff's claims are barred by the two-year statute of limitations. Finally, each Defendant

argues that the summary judgment record does not include sufficient evidence of deliberate indifference to support Plaintiff's Eighth Amendment claims under 42 U.S.C. § 1983.[10]

### A. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to produce sufficient evidence to allow a reasonable jury to return a verdict in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

---

[10] Defendants do not contend that the evidence is insufficient to create genuine issues as to Plaintiff's state law negligence claims (though they do claim entitlement to summary judgment on exhaustion and limitations grounds). However, Dr. Bell does ask that, if we grant Defendants summary judgment on all of Plaintiff's federal claims, we also remand the case to state court. Even if our decision did result in the dismissal of all of Plaintiff's federal claims, we would decline at this late stage to remand, considering the cost and time that all parties have put into the preparation of this already more than three-year-old case. See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." (emphasis added)); Carlsbad Tech., Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."); Growth Horizons, Inc. v. Delaware Cnty., 983 F.2d 1277, 1284-85 (3d Cir. 1993) (noting that decision whether to exercise supplemental jurisdiction of state law claims after federal claims are dismissed should be based on concerns of "judicial economy, convenience, and fairness to the litigants.").

**B.     Claims Over Which There Is No Dispute**

Plaintiff concedes that discovery has produced no evidence of deliberate indifference or negligence on the part of Dr. Richard Cusick. Accordingly, summary judgment will be granted on all claims against Dr. Cusick.

Further, Plaintiff concedes that the evidence is inadequate to prove that Dr. Felipe Arias, Dr. Richard Stefanic, and P.A.C. Frank Masino, violated his Eighth Amendment rights. Thus, summary judgment will be granted as to the federal claims against those defendants.

**C.     Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is required for all claims related to "prison conditions," Woodford v. Ngo, 548 U.S. 81, 85 (2006), including those challenging the medical treatment a prisoner received, see Porter v. Nussle, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."); Witzke v. Femal, 376 F.3d 744, 751 (7th Cir. 2004) (holding that complaints about medical treatment are actions "with respect to prison conditions"). The requirement also demands that the inmate "properly" exhaust, meaning that he or she must comply with the prison's deadlines and other procedural rules, or else risk losing the right to sue on the unexhausted claim in federal court. Woodford, 548 U.S. at 91.

There is, however, an exception to the requirement that a prisoner must meticulously follow established prison grievance procedures. Courts will consider a prisoner to have

exhausted his or her administrative remedies where a grievance that could have been denied on procedural grounds is instead considered and rejected on the merits. See, e.g., Hammett v. Cofield, 681 F.3d 945, 947 (8th Cir. 2012) (collecting circuit cases stating this rule). As the Third Circuit put it, the exhaustion requirement is satisfied if the inmate's "allegations have been fully examined on the merits by the ultimate administrative authority and have been found wanting." Camp v. Brennan, 219 F.3d 279, 281 (3d Cir. 2000). Once that authority has had a chance to squarely address the concerns raised in a grievance, the purposes of exhaustion, primarily to "provide[] prisons with a fair opportunity to correct their own errors," promote efficiency, and "produce a useful [administrative] record," have been served. Woodford, 548 U.S. at 94.

Plaintiff filed three grievances during the course of the events in this case. In the first, dated August 30, 2005, he complained that, despite three separate referrals from prison doctors at Graterford, he had yet to be seen by a specialist for his eye injury. The grievance was resolved on September 15, 2005, in a decision indicating that Plaintiff was "seen by ophthalmology on August 30," the same day he filed his grievance. (Arias Br., Ex. F.)

Plaintiff's second grievance, filed on May 1, 2006, concerned what he perceived to be failures in his medical care. The grievance noted that despite multiple trips to "sick call" with complaints about his eye:

> I see the ophthalmologist who on 4-25-06 told me I have uveitis, a cataract, and glaucoma in my right eye all have developed and come about after repeatedly being told nothing was wrong with my right eye. I ask[ed] the doctor to explain to me if nothing was wrong with my eye how come I am examined and everytime my eye has regressed and something else is wrong with my eye, he told me he does not have time to explain to me what is wrong with my eye he has to examine other people.
>
> I am continually given eyedrops and my eye has worsened because of neglect of medical personnel who continually tell me nothing is wrong

with my eye it is obvious the treatment of eyedrops is not stopping my right eye from worsening and the failure of medical staff to follow up on medical consults that were recommended has only caused the condition of my eye to deteriorate. I do not want to lose my eyesight because of the medical staff desire to cost cut and not send me to see a specialist as my eye continues to deteriorate it is obvious that everytime I am seen that something else is wrong with my eye and the proper measures to help me are not being taken to help me and maintain my vision in my right eye.

(Arias Br., Ex. F.)

This grievance was denied on May 10, 2006, in a decision that recited Plaintiff's treatment history and concluded "[y]ou are being followed appropriately and the recommendations are being followed." Plaintiff appealed this decision, and his appeal was denied on June 6, 2006. Plaintiff did not take a further appeal. (Arias Br., Ex. F.)

Plaintiff's final grievance was written on May 19, 2008, two years after his second grievance, and about three months after Plaintiff met with Dr. Waxman at the University of Pittsburgh Medical Center. The grievance reiterated several previous complaints, including that Dr. Bell and others at the prison had refused to explain Plaintiff's condition to him, but also added significant detail that was absent from prior grievances:

[An] emergency consult was filed and I was rushed to University of Pittsburgh Eye and Ear Hospital because the pressure in my eye caused pressure on my optic nerve. This was causing my vision loss. The cause of my glaucoma and vision loss was the steroid eyedrops prescribed by Dr. Bell (I had steroid-induced glaucoma) because of the pressure on my optic nerve I have lost 90% . . . of my vision in my right eye because I was misdiagnosed and not properly monitored. I was recently told that the damage to my optic nerve is irreparable and my vision in my right eye is virtually gone. I was told I had to file a grievance with Graterford because I was being ran in circles about who to address about this matter. No relief can be granted for the pain and suffering and the loss of my vision.

(Arias Br., Ex. F.)

Prison authorities initially denied Plaintiff's grievance on procedural grounds, indicating that [t]he issue(s) presented on the attached grievance has been reviewed and addressed

previously" in Plaintiff's first two grievances. On Plaintiff's appeal of that decision, the grievance was assigned to a reviewer for a substantive review. An initial review found that Plaintiff's course of treatment was appropriate. Thereafter, Plaintiff received a "Final Appeal Decision" on April 1, 2009, which read as follows:

> The Bureau of Health Care Services has reviewed the concerns of your grievance and determined that the medical care provided to you by the medical department at SCI Graterford for your right eye injury and loss of vision concerns has been reasonable and appropriate. The findings of the Bureau of Health Care Services' review concur with the Initial Review Response dated August 12, 2008. Your vision loss was a result of trauma induced glaucoma for which you were provided appropriate medical treatment and close monitoring. No evidence of neglect or deliberate indifference has been found.

(Arias Br., Ex. F.)

Defendants argue that this final response was not enough to satisfy the exhaustion requirement because the grievance was "untimely," and covered conduct already addressed by his prior, unexhausted grievances. But as the discussion of the law above explains, procedural deficiencies do not preclude exhaustion as long as the grievance was "fully examined on the merits by the ultimate administrative authority." Camp, 219 F.3d at 281. The Final Appeal Decision plainly satisfies that requirement, in that it indicates that the Bureau of Health Care Services fully reviewed the entire course of Plaintiff's treatment at SCI Graterford and determined that there was "[n]o evidence of neglect or deliberate indifference." Accordingly, we conclude that Plaintiff exhausted his administrative remedies before filing this lawsuit.

**D.     Statute of Limitations**

Pennsylvania has a two-year statute of limitations for personal injury claims. 42 Pa. Con. Stat. § 5524(2). This limitations period also applies to Plaintiff's section 1983 claims. Wilson v. Garcia, 471 U.S. 261, 276 (1985); O'Connor v. City of Newark, 440 F.3d 125, 126 (3d Cir.

2006). As we previously explained in an order denying Defendants' motion to dismiss, this action is deemed filed on January 26, 2010, the day Plaintiff gave his complaint to prison officials. See Houston v. Lack, 487 I.S. 266, 270-71 (1988) (articulating the prison mailbox rule and holding that pro se prisoner's notice of appeal deemed filed when handed over to prison authorities); Burns v. Morton, 134 F.3d 109, 112-13 (3d Cir. 1998) (applying prisoner mailbox rule to habeas petition, and collecting circuit cases applying the rule to prisoner complaints alleging violations of section 1983). Therefore, if Plaintiff's cause of action accrued on or before Friday, January 25, 2008, it is time-barred.

The date on which a cause of action accrues is governed by the discovery rule. Under that rule, the statute of limitations does not begin to run until the injured party is, or through reasonable diligence should have been, aware of both the injury and the fact that it was caused by the defendant. Fine v. Checcio, 870 A.2d 850, 858 (Pa. 2005). Because the discovery rule is viewed as an exception to the general rule that the statute of limitations begins to run when the injury occurs, the Plaintiff bears the burden of proving that it applies. Cochran v. GAF Corp., 666 A.2d 245, 249 (Pa. 1995). When the question of when a Plaintiff reasonably should have discovered his or her cause of action requires resolution of factual disputes, it can be put to the jury. Hayward v. Med. Ctr. of Beaver Cnty., 608 A.2d 1040, 1043 (Pa. 1992). Nevertheless, it is also a "well established principle that where the facts are so clear that reasonable minds cannot differ, the commencement period may be determined as a matter of law." Cochran, 666 A.2d at 248.

In this case, the facts surrounding the discovery of Plaintiff's injury and its cause are not the subject of significant disputes. Therefore, it is appropriate to determine when the statute of limitations began to run as a matter of law. Defendants argue that Plaintiff's May 1, 2006

grievance, which alleged that his "eye ha[d] worsened because of neglect of medical personnel" and blamed his deteriorating condition on the "medical staff desire to cost cut" demonstrated that he was aware of both his injury and its cause. At the very least, Defendants contend, Plaintiff was aware of the seriousness of his injury, and reasonable diligence would have led him to ascertain its cause well prior to January 26, 2008. Plaintiff responds that, despite his diligent efforts, he could not have been aware of a potential cause of action until February 5, 2008, when he first learned from Dr. Evan Waxman at the University of Pittsburgh Medical Center that his vision loss was permanent, and received a tentative diagnosis of steroid-induced glaucoma. (Arias Br., Ex. G, Harris Dep., at 129-33; Arias Br., Ex. K, Waxman Dep., at 36-37, 56.)

Defendants do not suggest that Plaintiff was or should have been aware that his blindness was caused by his long-term use of Pred Forte before he was seen by Dr. Waxman. Instead, they rely heavily on cases stating the general proposition that a plaintiff need not understand the precise medical cause of his or her injury before the statute begins to run. See Bigansky v. Thomas Jefferson Univ. Hosp., 658 A.2d 423, 430 (Pa. Super. Ct. 1995). Rather, the statute of limitations clock begins to tick once the "patient is aware or should reasonably have become aware that medical treatment is causing him personal injury." Id. (quoting Groover v. Riddle Memorial Hosp., 516 A.2d 53, 58 (Pa. Super. Ct. 1986)); see also Amvest Corp. v. Anderson Equip. Co., 358 Fed. Appx. 344, 347 (3d Cir. 2009) ("The Pennsylvania Supreme Court has looked favorably on 'tying commencement of the limitations period to actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause.") (quoting Wilson v. El-Daief, 964 A.2d 354, 364 (Pa. 2009)). Therefore, Defendants contend, Plaintiff's suspicion, expressed most clearly in his May 1, 2006

grievance (quoted above), that "neglect" was causing his eye to worsen, was sufficient to trigger the limitations period. We disagree.

The grievance, even read in the light most favorable to Defendants, expresses only Plaintiff's suspicion that the medical treatment he was receiving was not sufficient to save his eye. Plaintiff attributes this to staff "neglect," a "desire to cost cut," and a failure to take "proper measures" to save his vision. But the grievance lacks any significant factual basis for the vague accusations that his doctors are causing him harm. In fact, Plaintiff's most poignant criticism is not that his doctors are harming him by their treatment, but that they have refused to explain to him the nature of his injury or why it was continuing to worsen. This was confirmed by Plaintiff's appeal from the denial of his grievance, which focused even more clearly on his lack of information:

> I was not told I had glaucoma until April 25, 2006 and upon my shock of this diagnosis I tried to question Dr. Bell about my condition and was told he has more people to see and does not have time for my questions. . . . I was seen March 27th then on April 25th 2006 when I was told by Dr. Bell that I have glaucoma and I am trying to ask if everytime I am seen why is my eye condition worsening if everything is being done to treat my eye condition. No one has any answers or will even answer my questions. Sir Ms. Knauer [initial grievance reviewer] says Dr. Bell ordered appropriate eyedrops. Sir I have not received eyedrops if they were present it has been at least two months or more I have not received any kind of medical treatment or eyedrops.

> (Arias Br., Ex. F.)

Thus, the grievance did not so much reflect that Plaintiff believed his treatment to be harmful (indeed, he requested the eyedrops he had been prescribed), but that he was not receiving enough treatment, and his doctors were not adequately explaining his condition.

It is true, as Defendants argue, that "unrebutted suspicion" that one has suffered an injury caused by another will often be sufficient by itself to start the limitations clock. Debiec v. Cabot

<u>Corp.</u>, 352 F.3d 117, 132 (3d Cir. 2003). But suspicion that might otherwise trigger the statute can be overcome by assurances from a potential plaintiff's doctors that he either does not have an injury, or that his injury was not caused by the defendant. <u>Id.</u> Thus, in <u>Bohus v. Beloff</u>, where a plaintiff's persistent pain following botched foot surgery was explained away by various doctors as an expected part of recovery, the court concluded that the jury could have found, in light of these assurances, that the plaintiff's lawsuit, brought almost three years later, was timely. 950 F.2d 919, 922-23, 926 (3d Cir. 1991); <u>see also</u> <u>Corbett v. Weisband</u>, 551 A.2d 1059, 1068-70 (Pa. Super. Ct. 1988) (treating physician's repeated assurance that infected knee was "stable," along with later doctor's failure to detect infection, was sufficient evidence to find that statute of limitations did not begin with plaintiff's acknowledgment of post-surgery pain); <u>Frisbie v. Wiseman</u>, 56 Pa. D. & C. 4th 403, 407-08 (Pa. Com. Pl. 2001) (holding that doctor's assurances that she was "sure" the patient had genital herpes created issue of fact as to whether statute of limitations had run on claim for misdiagnosis of patient's vaginal cancer).

Plaintiff's case resembles those cited above, in which doctors tell a patient that signs that might ordinarily put the patient on notice of a negligently-inflicted injury are in fact the product of a normal healing process or some other cause. Plaintiff received repeated assurances that the treatment and monitoring he was receiving was appropriate. He had every reason to believe what his doctors told him: that his deteriorating vision was related not to his treatment, but to the traumatic injury he suffered. Dr. Bell's notes reflect that at an April 25, 2006 visit, Plaintiff "grew very hostile [and] demanded to know what was wrong with him." (Arias Br., Ex. O.) Dr. Bell reassured him that "these meds were best." (Arias Br., Ex. O.) Responses to Plaintiff's grievances repeatedly indicated that he was receiving "appropriate" treatment and that his physicians' "recommendations are being followed." (Arias Br., Ex. F.) The initial response to

Plaintiff's final grievance again repeated that his glaucoma was "trauma-induced," not steroid-induced. To hold, in the face of these representations, that Plaintiff should have nonetheless been aware enough of his injury and its cause to trigger the statute of limitations would run afoul of the general rules that "lay persons should not be charged with greater knowledge of their physical condition than that possessed by the physicians on whose advice they must rely," and that a patient may generally rely on the doctor's advice until "common sense" dictates that reliance is no longer reasonable. Debiec, 352 F.3d at 131-31 (quoting Bohus, 950 F.2d at 929) (internal quotation marks omitted).

In order to take advantage of the discovery rule, as well as to justify his reliance on his doctors' assurances that his treatment was appropriate, Plaintiff must have exercised reasonable diligence to uncover his injury and its cause, which may "require one to seek further medical examination as well as competent legal representation." Cochran, 666 A.2d at 249. But Plaintiff's status as an inmate meant that he could not simply receive a second opinion from an outside doctor. He was limited to seeing the doctors that the prison allowed him to see. See Estelle v. Gamble, 429 U.S. 97, 103 (1976) ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.") Even if we were to view the record in the light most favorable to the Defendants, Plaintiff's repeated requests for more information from prison doctors, including his filing of multiple grievances and demands for appropriate follow-ups, satisfied his duty of reasonable diligence as a matter of law. In addition, less than a month after his visit to Dr. Waxman, where he learned that his vision loss was permanent, Plaintiff consulted with a law firm "regarding a potential personal injury action related to the irreversible loss of vision in his right eye." (Harris Br. in Opp. to Arias Motion, Ex. H.) This conduct amounted to reasonable steps to discover the nature and cause of his injuries,

and to uncover his potential cause of action. We therefore conclude that the statute of limitations did not begin to run until February 5, 2008,[11] and that Plaintiff's lawsuit was timely filed.[12]

### E. Plaintiff's Section 1983 Claims

All Defendants have moved for summary judgment on Plaintiff's constitutional claims. Because the only section 1983 claims remaining are against Dr. Bell and Prison Health Services, see supra Part II.B, only those Defendants will be considered.

#### 1. Dr. Bell

Under section 1983 and the Eighth Amendment to the United States Constitution, "deliberate indifference to a prisoner's serious illness or injury states a cause of action." Estelle, 429 U.S. at 105. To make out a constitutional claim premised on inadequate treatment, an inmate must make two showings: (1) that he or she has a serious medical need, and (2) that the defendant demonstrated deliberate indifference to that need. Id. at 106; Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). Dr. Bell does not suggest that the deterioration of Plaintiff's vision was not a serious medical need. Instead, he argues that the record is insufficient to create an issue of fact as to whether he was deliberately indifferent.

---

[11] We note that Defendants filed a motion to dismiss on March 22, 2011 that took the same position on the accrual of Plaintiff's cause of action: "Presently, Plaintiff's cause of action accrued on February 6, 2008, when he was treated at the University of Pittsburgh Medical Center and diagnosed with the injuries that form the basis of his claims." (Arias Motion to Dismiss, Doc. No. 36, at 13.)

[12] Plaintiff may also be entitled to tolling based on the doctrine of fraudulent concealment, which in these circumstances operates similarly to the discovery rule. That doctrine requires "an affirmative and independent act of concealment that would divert or mislead the plaintiff from discovering the injury." Bohus, 950 F.2d at 925. Despite carrying the "fraudulent" adjective, the term itself can be misleading, because the concealment "may be intentional or unintentional." Id. However, because fraudulent concealment demands a higher burden of proof (clear and convincing evidence) than the discovery rule, there is no need to rely on it here.

Deliberate indifference does not entail a purpose to cause the harm, or even knowledge that the harm is substantially certain to occur. Rather, deliberate indifference requires that an actor have subjective understanding of an excessive risk to an inmate's health, and then disregard that risk. Farmer v. Brennan, 511 U.S. 825, 836-37 (1970); Kaucher v. Cnty. of Bucks, 455 F.3d 418, 427 (3d Cir. 2006) (observing that deliberate indifference entails the conscious disregard of a substantial risk of serious harm). A plaintiff can generally make the appropriate showing by producing evidence that prison officials intentionally denied or delayed care for a serious medical need. Giles v. Kearney, 571 F.3d 318, 330 (3d Cir. 2009). Alternatively, where the question is not lack of care but inadequate care, a plaintiff may demonstrate deliberate indifference by showing that a doctor "insisted on continuing courses of treatment that the doctor knew were painful, ineffective, or entailed substantial risk of serious harm to prisoners." White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990). However, disputes over the adequacy of care are usually not a good fit for section 1983 claims, because "federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." Fantone v. Herbik, 2013 WL 2564429, at *2 (3d Cir. June 12, 2013) (quoting United States ex rel. Walker v. Fayette Cnty., 599 F.2d 573, 575 n.2 (3d Cir. 1979)) (internal quotation mark omitted).

White provides several examples of allegations sufficient to meet the subjective conscious disregard standard. Among those the Third Circuit found sufficient were a claim that the prison doctor refused to provide a patient with a medication necessary to mitigate a serious risk of peptic ulcers associated with a separate medication he was taking, White, 897 F.2d at 109; a claim that a doctor continued to prescribe a seizure medication different from one initially prescribed, despite the fact that the substitute greatly increased the violence and frequency of

seizures, id. at 110; and a claim that a doctor denied a patient a particular treatment that had been applied successfully at a different institution, and instead, for no medical reason, insisted on trying several painful treatments that had already failed to provide relief, id. at 110-11. These types of "persistent conduct in the face of resultant pain and risk of permanent injury"—yet few or no medical benefits—are sufficient to state an Eighth Amendment claim. Unpublished decisions make a similar distinction between cases in which mere negligence or medical disagreement accounts for the alleged deficiencies in care, and cases in which a prison official is subjectively aware of the painful and ineffectual nature of a given treatment, but nonetheless refuses to change course. Compare Riddick v. Modery, 250 Fed. Appx. 482, 484 (3d Cir. 2007) (holding physician not liable under section 1983 for substituting less effective medication for medications not on prison's approved list) with Thomas v. Varano, 2013 WL 2399286, at *3 (3d Cir. June 4, 2013) (holding allegation that doctor substituted weaker pain medication for more effective one for no medical reason, thereby increasing plaintiff's cancer pain, stated a section 1983 claim).

After careful review of the precedent referred to above, we conclude that the evidence of record, viewed in the light most favorable to Plaintiff, could support the conclusion that Dr. Bell continued to prescribe Pred Forte despite knowledge of the serious risk associated with prolonged use of the drug, namely, increased intraocular pressure. Dr. Bell acknowledged during his deposition that Plaintiff's disease was severe, and that it threatened his vision. He also acknowledged that prolonged use of Pred Forte can cause increased pressure in the eye, damaging the optic nerve. Despite this knowledge, and while under Dr. Bell's care, Plaintiff used Pred Forte more or less continually for longer than two years (from August 2005 to February 2008). Dr. Bell testified that he would under "no circumstances" prescribe Pred Forte for longer

than six months, suggesting that there was no medical reason for the prolonged use. Moreover, Plaintiff went lengthy stretches—more than a year at one point—without intervention from Dr. Bell or any other ophthalmologist. Dr. Bell took no affirmative steps to ensure that Plaintiff's eye pressure was monitored or treated between these appointments, despite his acknowledgment that monitoring would be appropriate for someone using a corticosteroid for a long period of time. (Arias Br., Ex. I, Bell Dep., at 104.) Taken together, a jury could determine that Dr. Bell's actions demonstrate the persistent use of a treatment (Pred Forte) that he knew was worsening—not helping—Plaintiff's condition.[13] Accordingly, summary judgment will be denied as to Dr. Bell.

### 2. Prison Health Services

Under section 1983, Prison Health Services (PHS) cannot be held vicariously liable for the acts or omissions of its employees. Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 583-84 (3d Cir. 2003). Instead, to be entitled to press his constitutional claim against PHS, Plaintiff must show that a relevant policy or custom, devised by PHS, caused his injury. Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 403-04 (1997). Where, as here, a plaintiff complains about a lack of proper policies, the evidence must allow a jury to conclude that "the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in a violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to that need.'" Natale, 318 F.3d at 584 (quoting Bryan Cnty., 520 U.S. at 418).

---

[13] In reaching this conclusion, we are mindful that "issues of knowledge and intent are particularly inappropriate for resolution by summary judgment, since such issues must often be resolved on the basis of inferences drawn from the conduct of the parties." Riehl v. Travelers Ins. Co., 772 F.2d 19, 24 (1985).

Natale involved an inmate who required insulin, but was incarcerated for 21 hours before being provided with a dose. 318 F.3d at 578. The inmate alleged that PHS violated his constitutional rights by its "failure to establish a policy to address the immediate medication needs of inmates with serious medical conditions." Id. at 584-85. The court concluded that a reasonable jury could find that the absence of such a policy created a sufficiently obvious and serious risk to amount to deliberate indifference.

The evidence in this case could support a similar finding. Viewed in the light most favorable to Plaintiff, PHS allowed physician's assistants like Mr. Masino, who admittedly had no knowledge of the risks or side-effects of long-term use of Pred Forte, to prescribe the drug for six months or longer, without consultation with an eye specialist.[14] Indeed, Dr. Bell flatly testified that he did not tell anyone to prescribe Pred Forte for 180 days or longer. (Arias Br., Ex. I, Bell Dep., at 60.) Yet the medication was prescribed to Plaintiff for six months or longer on at least three occasions: October 4, 2005, June 11, 2006, and January 4, 2007. (Arias Br., Ex. Q, Arias Dep., at 95-96; Arias Dep., Ex. E, Nwosu Dep., at 109-10; Arias Br., Ex. J, Masino Dep., at 85-91.) A policy (or lack thereof) that allowed medication with potentially dangerous side effects to be prescribed for long periods by a prison official who has no understanding of those side effects could be found to amount to deliberate indifference.

In addition to PHS's medication policies, Plaintiff has produced an expert who is prepared to testify that "lack of follow up procedures" to ensure continuity of care for Plaintiff's complicated eye condition evidences a "shocking disregard" for Plaintiff's serious medical

---

[14] The order was apparently reviewed by Dr. Arias, the medical director, because he co-signed it the next day. A jury could properly find that, although this policy ensured review of an order by a physician (though not a specialist), it was little more than a rubber stamp for the decision of the physician's assistant. Dr. Arias testified that it was "routine" for inmates to request renewals for medication and for those requests to be granted without consultation with a specialist. (Arias Br., Ex. Q, Arias Dep., at 142.)

needs. (Arias Br., Ex. M, Moore Report, at 7.) There is also evidence in the record to support this conclusion. It appears that Dr. Bell's orders for follow-ups were not complied with on multiple occasions. For example, despite Dr. Bell's order for a four month return visit on October 4, 2005, Plaintiff was not seen again by him until almost seven months later, and more than a month after Plaintiff complained to PHS that he was not being seen on the appropriate schedule. After the April 2006 visit, which included another order for a four month follow-up, Plaintiff did not see Dr. Bell again for over a year, during which time non-ophthalmologists renewed the medications that Plaintiff now contends were damaging his eye. If proven, PHS's lack of proper policies for ensuring return-visit orders were followed, and for ensuring communication between specialists and prison officials to provide adequate care for complicated and specialized medical conditions, could be found to constitute deliberate indifference on the part of PHS. See Milliner v. DiGuglielmo, 2011 WL 2357824, at *7 (E.D. Pa. June 8, 2011) (concluding that "systemic deficiencies" in the procedures for providing follow-up care could satisfy the deliberate indifference standard); Morton v. City of Phila., 2011 WL 536545 at *7 (E.D. Pa. Feb. 15, 2011) (denying summary judgment where jury could find that "PHS . . . had no procedures in place for the treatment and follow-up of an inmate's orthopedic needs, ensuring consistent and adequate methods of communication among the physicians in securing that treatment, making certain that inmates' medical needs were followed by medical staff, and making certain that physicians orders were addressed"). Thus, PHS's request for summary judgment will be denied.

## III. Conclusion

Defendants have urged here that Plaintiff's claims suffer from both legal and factual deficiencies. For the reasons above, with the exception of a few of Plaintiff's constitutional claims, we disagree. Plaintiff received a review of all aspects of his medical treatment from the

highest administrative authority in the prison, thus satisfying his obligation to exhaust his administrative remedies. Because Plaintiff received repeated assurances from medical staff that he was receiving the best treatment for his eye, and only learned from Dr. Waxman that Defendants' conduct might have caused him permanent blindness, his claims are not barred by the two-year statute of limitations. Finally, Plaintiff has presented evidence from which a jury could conclude that both Dr. Bell and Prison Health Services were deliberately indifferent to his serious medical needs. Accordingly, Defendants' motions for summary judgment will be granted in part and denied in part.

An appropriate order follows.